UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | |
|---|---|
| **NICHOLAS MILLER** | **CIVIL DOCKET NO. 6:23-cv-00566** |
| **VERSUS** | **JUDGE DAVID C. JOSEPH** |
| **COX OPERATING, LLC, ET AL** | **MAGISTRATE JUDGE CAROL B. WHITEHURST** |

## MEMORANDUM RULING

Before the Court are two motions for summary judgment filed in the above-captioned matter, in which Plaintiff Nicholas Miller (hereinafter, "Plaintiff") alleges negligence claims against numerous defendants following an offshore workplace accident. The motions are as follows: (i) a MOTION FOR SUMMARY JUDGMENT filed by Defendants Ermine "Sonny" Miller ("Sonny") and Industrial & Oilfield Services, Inc. ("IOS") (hereinafter, the "IOS Motion")[1] [Doc. 238]; and (ii) a MOTION FOR SUMMARY JUDGMENT filed by Gulf South Services, Inc. (hereinafter, the "GSSI Motion") [Doc. 239]. Plaintiff and the non-moving Defendants[2] oppose the IOS Motion [Docs. 252, 254, respectively], and the GSSI Motion [Docs. 251, 253, respectively]. IOS and GSSI filed replies. [Docs. 260, 258]. For the following reasons, the IOS and GSSI Motions are DENIED.

---

[1] All references to IOS include Sonny Miller, unless otherwise noted.

[2] The non-moving Defendants include Cox Operating, LLC (hereinafter "Cox"); Certain Underwriters at Lloyds London Subscribing to Policy B0702GL3036710 (hereinafter, "Underwriter One"); Certain Underwriters at Lloyds London Subscribing to Policy B0702GL3036700 (hereinafter, "Underwriter Two"); Axis Specialty Europe (hereinafter, "Axis"); Crosby Energy Services, Inc. (hereinafter, "Crosby"); and Cactus Wellhead, LLC (hereinafter, "Cactus").

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

The incident giving rise to this litigation occurred on South Timbalier 26D (hereinafter, "ST26D"), a fixed platform on the Outer Continental Shelf off the coast of Louisiana, approximately 8 miles south of the Port of Fourchon. [Doc. 239-12, p. 8]. Defendant Cox was the owner and operator of ST26D. [Doc. 238-2, p. 1]. But as is common on offshore platforms,[3] Cox contracted with numerous independent contractors to perform work on ST26D. The independent contractors working on STD26D that are relevant to the pending motions are: (i) Ace Investments, LLC (hereinafter, "ACE"); (ii) GSSI; (iii) IOS; and (iv) Crosby.

ACE was engaged in steel renewal works for a construction project on the platform, with Plaintiff working as its welder on the production deck. [Doc. 239-12, p. 8]; [Doc. 239-4, p. 8]; [Doc. 238-3, p. 3].[4] GSSI was contracted to provide scaffolding and fire watch services for the construction project. [Doc. 253-1, p. 1]; [Doc. 239-4, p. 19]. At the time of the incident, the only GSSI employees on the platform were Jorge Cruz and Hugo Navarro. [Doc. 239-4, pp. 18-19]. Cox also enlisted Crosby to provide the Persons in Charge ("PICs") on the platform, Charles Brenner ("Brenner") and Jacob Prince ("Prince"). [Doc. 239-11, pp. 9-10]. Their roles included, *inter alia*, reviewing and signing off on work permits [Doc. 252-15, p. 6]; knowing and following Cox's safety policies and procedures [Doc. 252-20, p. 48]; and possessing ultimate

---

[3]   As explained by Sonny, "[p]retty much everybody in the Gulf is contract employees, very few company personnel hired directly through the company to work offshore on these platforms." [Doc. 238-3, p. 6].

[4]   The platform "consists of a complex of three fixed production platforms linked by walkways which are named South Timbalier (ST) 26 -C, D, and F respectively." *Id.*

work authority ("UWA") [Doc. 238-8, p. 4]. Likewise, Cox contracted with IOS to provide a construction supervisor, Sonny, to oversee the jobs being performed by ACE and GSSI. [Doc. 238-3, p. 4]. Sonny was "responsible for knowing and following Cox's safety policies and procedures[.]" *Id.* at p. 10. He reported to Brenner, Prince, and his onshore contact, Scott Bordelon ("Bordelon"), who was Cox's Construction Superintendent. *Id.* at p. 5.

Cox also had a contract with StormGeo, a third-party weather company. [Doc. 238-10, p. 3]. The PICs on the platform were responsible for reviewing the forecasts and monitoring weather conditions throughout the day. [Doc. 238-8, pp. 12-13]. At some time before the date of Plaintiff's accident, Cox removed ST26D from its StormGeo account. *Id.* at p. 9. On the day of the accident, weather conditions were initially reported as good, with no mention of severe weather during the morning safety meeting. [Doc. 239-11, p. 18]. But a severe weather alert was issued by StormGeo at 2:53 PM CDT, warning of the presence of severe thunderstorms with lightning, large hail, isolated tornadoes, and wind gusts up to 80 knots. [Doc. 238-15]. At some point after this alert, a severe storm hit the platform, with wind gusts reaching between 85 to 105 mph. [Doc. 239-12, pp. 20-21].

Prior to the accident, Plaintiff was "welding [a] new steel structure into position on the production deck[.]" *Id.* at p. 9. ACE's supervisor, Eric Lara, was on fire watch while Plaintiff was welding. [Doc. 239-6, pp 9-10]. In response to the severe weather, Sonny rushed to the production deck and called an "all stop." [Doc. 238-3, p. 32]. While attempting to climb to a higher level of the platform, Plaintiff

was thrown to the ground and hit by a metal tool cabinet that was "reportedly blown over by the winds impacting the platform." [Doc. 239-12, p. 9]. The metal tool cabinet, owned by Cox, was not secured to the deck. *Id.* Plaintiff alleges that the cabinet hit "him directly on the back and he was pinned between the cabinet and a pile of new sheets of metal grating." *Id.* at p. 14.

On February 1, 2022, Plaintiff filed this lawsuit against Cox asserting negligence claims under the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1331, *et seq.* [Doc. 1]. Plaintiff amended his Complaint six times, adding different defendants in each successive complaint, and filing his final Amended Complaint on January 13, 2025. [Doc. 200]. Plaintiff asserts in his Complaint that he was severely injured when the storage locker fell on him as a result of the negligence of the above-named Defendants.[5] *Id.* at pp. 9-10. The two pending motions for summary judgment, [Docs. 238, 239], are now ripe for ruling. This Court has jurisdiction over

---

[5] Specifically, Plaintiff alleges the follow negligent acts for <u>all</u> the named Defendants:

a. Failing to properly secure the storage locker to the platform; b. Having knowledge of the propensity for inclement weather, yet failing to assure the storage locker was properly secured to the platform; c. Failing to warn those on the platform of the fact the storage locker was not secured to the platform; d. Failing to timely evacuate NICHOLAS MILLER and others on the platform to a safe area considering the approach of severe inclement weather; e. Improper/inadequate equipment; f. Failure to provide a safe place to work; g. Negligent training; h. Negligent planning; i. Negligent supervision; j. Negligent maintenance; k. Creating and/or permitting the existence of unreasonably dangerous conditions upon its fixed platform; l. Violation of state and federal safety rules and regulations; m. Violation of company rules and regulations created for the safety of individuals working on its fixed platforms; n. Any other acts of negligence which may be revealed at or before the trial of this matter.

[Doc. 18, pp. 4-10].

Plaintiff's claims pursuant to OCSLA, 43 U.S.C. § 1349(b)(1), and federal question jurisdiction under 28 U.S.C. § 1331.

## LAW AND ANALYSIS

### I. Summary Judgment Standard

A court should grant a motion for summary judgment when the pleadings, including the opposing party's affidavits, "show that there is no dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Hefren v. McDermott, Inc.*, 820 F.3d 767, 771 (5th Cir. 2016), *quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case. *Anderson, Inc.,* 477 U.S. at 248.

The movant bears the burden of demonstrating the absence of a genuine dispute of material fact but need not negate every element of the nonmovant's claim. *Hongo v. Goodwin*, 781 F. App'x 357, 359 (5th Cir. 2019), *citing Duffie v. United States*, 600 F.3d 362, 371 (5th Cir. 2010). If the movant meets this burden, the burden then shifts to the nonmovant who is required to "identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim." *Johnson v. Deep E. Texas Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 301 (5th Cir. 2004). However, summary judgment cannot be defeated through "[c]onclusional allegations and denials, speculation, improbable inferences,

unsubstantiated assertions, and legalistic argumentation." *Acker v. Gen. Motors, L.L.C.*, 853 F.3d 784, 788 (5th Cir. 2017), *quoting Oliver v. Scott*, 276 F.3d 736, 744 (5th Cir. 2002).

In applying this standard, the Court should construe "all facts and inferences in favor of the nonmoving party." *Deshotel v. Wal-Mart Louisiana, L.L.C.*, 850 F.3d 742, 745 (5th Cir. 2017); *see Anderson*, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."). The motion for summary judgment should be granted if the non-moving party cannot produce sufficient competent evidence to support an essential element of its claim. *Condrey v. Suntrust Bank of Ga.*, 431 F.3d 191, 197 (5th Cir. 2005).

## II.  OCSLA and Louisiana Negligence Law

"Because the dispute in this case stems from events that occurred in the Gulf of Mexico above the [O]uter Continental Shelf [], OCSLA applies." *Tetra Techs., Inc. v. Cont'l Ins. Co.*, 814 F.3d 733, 738 (5th Cir. 2016). OCSLA "adopts the law of the adjacent state as surrogate federal law, to the extent that it is not inconsistent with other federal laws and regulations; thus the law applicable is 'federal law,' supplemented by state law of the adjacent state." *Fruge ex rel. Fruge v. Parker Drilling Co.*, 337 F.3d 558 (5th Cir. 2003). Therefore, "in this matter, the Court must look to Louisiana law." *Soileau v. Era Helicopters LLC*, 2018 WL 4997148, at *1 (W.D. La. Oct. 15, 2018), *citing Fornah v. Schlumberger Technology Corp.*, 737 F. App'x 677, 680 (5th Cir. 2018) ("[W]e agree with the district court that maritime law

does not apply of its own force in these proceedings and consequently, that Louisiana law applies to [the plaintiff's] negligence claims.").

Louisiana courts employ a duty-risk analysis in adjudicating negligence claims under Louisiana Civil Code article 2315. *Ryder v. Union Pac. R.R. Co.*, 945 F.3d 194, 199 (5th Cir. 2019), *citing Duncan v. Kansas City S. Ry. Co.*, 773 So. 2d 670, 675 (La. 2000). To establish a cause of action for negligence, a plaintiff must establish that: (i) the defendant had a duty to conform his conduct to a specific standard; (ii) the defendant's conduct failed to conform to that standard; (iii) the defendant's breach was a cause in fact of the plaintiff's injuries; (iv) the defendant's breach was a legal cause of the plaintiff's injuries; and (v) actual damages. *Coastal Bridge Co., L.L.C. v. Heatec, Inc.*, 833 F. App'x 565, 568 (5th Cir. 2020), *citing Lemann v. Essen Lane Daiquiris, Inc.*, 923 So. 2d 627 (La. 2006).

Under Louisiana law, "[m]asters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed." La. Civ. Code art. 2320. Likewise, "[t]he master is answerable for the offenses and quasi-offenses committed by his servants[.]" *Id.* However, "a principal is generally not liable for the acts of its independent contractor." *Echeverry v. Jazz Casino Co., L.L.C.*, 988 F.3d 221, 228 (5th Cir. 2021), *citing Graham v. Amoco Oil Co.,* 21 F.3d 643, 645 (5th Cir. 1994). But "there are exceptions to the general rule against vicarious liability [for independent contractors]." *Voces v. Energy Resource Technology, G.O.M., L.L.C.,* 704 F. App'x 345, 346 (5th Cir. 2017). First, a plaintiff can simply "show the existence of an employer/employee relationship. Our

jurisprudence recognizes the single most important factor in determining an employment relationship is the right of the employer to control the work of the employee." *Poynor v. Cure,* 443 So. 2d 1151, 1155 (La. Ct. App. 1983), *writ denied,* 446 So. 2d 1225 (La. 1984).[6]

Likewise, liability can attach to an independent contractor "when the injury results from an ultrahazardous activity [or] when the principal reserves the right to supervise or control the work of the contractor." *Stovall v. Shell Oil Co.*, 577 So. 2d 732, 742 (La. Ct. App. 1991), *writ denied,* 582 So. 2d 1309 (La. 1991). The "primary inquiry is whether, and to what extent, the principal contractually reserved the right to control the independent contractor's work." *Meeks v. BIS Salamis, Inc.*, 2011 WL 13334203, at *5 (S.D. Tex. Oct. 11, 2011), *citing Coulter v. Texaco, Inc.,* 117 F.3d 909, 912 (5th Cir. 1997). But the Court must also consider the "extent to which the principal actually exercises control[,]" while acknowledging that the "supervision and control that is actually exercised by the principal is less important than the right to control that is contractually reserved." *Ukudi v. McMoran Oil & Gas, L.L.C.,* 587 F. App'x 119, 122 (5th Cir. 2014); *Westley v. Out W. Express, LLC*, 2023 WL 8934937, at *5 (E.D. La. Dec. 27, 2023). "Operational control exists only if the principal has direct supervision over the step-by-step process of accomplishing the work such that the

---

[6] There are several doctrines that a plaintiff can use to establish a relationship that subjects a defendant to Louisiana Civil Code article 2320. *See e.g. Mejia v. Boykins Bros.,* 52 So. 3d 82 (La. Ct. App. 1991), *writ denied,* 582 So. 2d 1309 (La. 1991) (discussing the borrowed employee doctrine); *Morgan v. ABC Mfr.,* 710 So. 2d 1077, 1083 (La. 1998), *citing* Thomas C. Galligan, Jr., *A Primer on the Patterns of Louisiana Workplace Torts*, 55 LOUISIANA LAW REVIEW at 91 (1994) (discussing the dual employment doctrine). *See also Parkman v. W&T Offshore, Inc.*, 675 F. Supp. 3d 684 (M.D. La. 2023) (the dual employment doctrine is "not inconsistent with federal law and, therefore, could be applied[.]").

contractor is not entirely free to do the work in his own way." *Fruge ex rel. Fruge,* 337 F.3d at 564, *citing Coulter,* 117 F.3d at 912 and *LeJeune v. Shell Oil Co.,* 950 F.2d 267-70 (5th Cir.1992).

### III. The IOS Motion [Doc. 238]

The IOS Defendants seek summary dismissal of the Plaintiff's claims against them on grounds that Cox had operational control over the platform. [Doc. 238-1, p. 4]. Specifically, the IOS Motion points to the MSA between Cox and IOS as evidence of Cox's control over the safety and management of the platform. *Id.* at pp. 7-24. The IOS Defendants emphasize that while Cox did not step in during the job and modify how Sonny and IOS were to perform the work, it nevertheless exerted operational control because IOS was required by the MSA to adhere to Cox's policies from the moment work commenced. [Doc. 260, p. 3]. Plaintiff disputes that the MSA's language demonstrates Cox's operational control and further argues the independent negligence of both Sonny and IOS. [Doc. 252]. The non-moving Defendants contend that whether and to what extent Cox had direct control over Sonny and IOS is a disputed factual issue making summary judgment improper. [Doc. 254, p. 7].[7]

The arguments set forth in the IOS Motion fail for several reasons. First, Section 6 of the MSA makes clear that Cox did not "<u>contractually reserve[]</u> the right

---

[7] Both Plaintiff and the non-moving Defendants assert that the IOS Motion is procedurally deficient for lack of a statement of material facts. [Doc. 254, p. 7]; [Doc. 252, p. 5]. The Court encourages the parties to review the Local Rules prior to engaging in future litigation in this Court. The Local Rules no longer require a separate statement of uncontested material facts, and any such filings are not considered by the Court. Local Civil Rule 56 (W.D. La).

to control the independent contractor's work." *Meeks,* 2011 WL 13334203, at *5 (emphasis added); [Doc. 238-6, p. 3] ("[Section] 6.0 … In the performance of the Services, Contractor shall be deemed to be an Independent Contractor. … Company [has] no control over the manner and method of performance."). Furthermore, the language in the MSA that requires IOS to follow Cox's "instructions and specifications" does not establish Cox's operational control over either Sonny or IOS. *See* [Doc. 238-6, §§ 3.0, 3.1, 3.4, 6.1, 15.3] (language in the MSA relied upon in the IOS Motion).[8] Under Louisiana law, overseeing a contractor's compliance with its contractual obligations does not create a relationship of operational control. *Voces,* 704 F. App'x at 354 Similarly, "operational control is not established 'merely because the principal contractually retained general rights—for example, the right to order the work stopped or resumed, inspect its progress, receive reports, or demand that an independent contractor develop and implement safety procedures.'" *See, e.g., Coleman v. BP Expl. & Prod., Inc.,* 19 F.4th 720 (5th Cir. 2021).

The IOS Motion's argument that Cox had operational control because all those working aboard the platform had to adhere to Cox's safety protocols is also unpersuasive. *See Alexander v. Kevin Gros Consulting & Marine Servs., Inc.,* 2016 WL 430413, at *6 (E.D. La. Feb. 4, 2016) (no genuine dispute of material fact as to operational control from requirement in MSA to follow safety protocols of principal or principal's safety manual). To be clear, "under Louisiana law, '[t]he fact that a

---

[8]    Cox entered into MSAs with the same language with other contractors aboard the platform, such as Crosby. *See* [Doc. 238-9].

principal takes an active interest in the safety of the employees of its independent contractor does not, in and of itself, constitute direct operational control.'" *LeJeune,* 950 F.2d at 270. Likewise, Sonny and IOS fail to establish Cox's operational control over the platform through the actions of the PICs, Brenner and Prince. While Brenner and Prince were responsible for knowing and implementing Cox's policies, there is, at a minimum, a factual issue as to whether Cox controlled the "step-by-step process" of their work and duties.[9] Moreover, the IOS Motion fails to establish that Brenner and Prince's actions are otherwise attributable to Cox as a matter of law. Brenner and Prince were formally employed by Crosby and no evidence has been presented, for instance, that the PICs were borrowed employees of Cox.[10] [Doc. 238-3, p. 6]; [Doc. 238-9].

Cox's control over weather reports on the day of the incident is likewise insufficient alone to establish operational control. The responsibility to disseminate weather reports is not the type of oversight that creates a relationship of operational control. *See Fruge ex rel. Fruge,* 337 F.3d at 564. Rather, the Court notes that Cox's

---

[9] *See e.g. Fruge ex rel. Fruge, supra,* 337 F.3d at 564. *See e.g. Allen v. Seacor Marine,* 423 F. Supp. 2d 653 *(*S.D. Tex. 2003) (no operational control even through the owner held daily safety meets because the contract did not grant them the right to direct the contractor's work details)*; Randall v. Fieldwood Energy, LLC,* 2022 WL 21805918 (S.D. Tex. June 27, 2022) (owner did not exert operational control over independent contractor even though independent contractor's employee had "ultimate work authority" and led safety meetings).

[10] *See Mejia, supra,* 52 So. 3d 82 ("While there is no fixed test, the factors to be considered in determining the existence of a borrowed employee relationship include: right of control; selection of employees; payment of wages; power of dismissal; relinquishment of control by the general employer; which employer's work was being performed at the time in question; the existence of an agreement, either implied or explicit, between the borrowing and lending employer; furnishing of instructions and place for the performance of the work; the length of employment; and the employee's acquiescence in a new work situation.").

control over the dissemination of weather information is analogous to an obligation to ensure safety protocols are followed, which courts consistently find does not establish operational control. *See Alexander,* 2016 WL 430413, at *6.

Moreover, the evidence presented by Sonny and IOS fails to establish that Bordelon, Cox's Construction Superintendent, exerted sufficient control over the platform to establish Cox's operational control. Bordelon's primary role was the dissemination of weather information and ensuring safety and compliance with Cox's policies. [Doc. 254-1, pp. 4-6]. And Bordelon's limited role in supervising the work on the platform — such as receiving daily construction reports — is insufficient alone to create a genuine dispute of material fact as to Cox's operational control. *Id.*; *Fruge ex rel. Fruge,* 337 F.3d at 564 ("Periodic inspections by a principal's 'company man' do not equate to that principal retaining control over the operations conducted by a drilling crew."). To the extent the IOS Motion asserts that Cox had operational control merely as a result of Bordelon's stop-work authority, this argument also fails. *Boutwell v. Chevron U.S.A., Inc.,* 864 F.2d 406, 408 (5th Cir.1989) (stop-work authority alone is insufficient to establish operational control).

Lastly, under Louisiana law "[e]ven if [the employer] ultimately acknowledges, or otherwise is held financially responsible for [its employee's] actions, the Louisiana Supreme Court recently has emphasized the importance of separately analyzing and quantifying the fault of employees and their employers." *Agbasi v. Walmart, Inc.,* 2023 WL 2673967, at *4 (W.D. La. Mar. 13, 2023), *report and recommendation adopted,* 2023 WL 2668440 (W.D. La. Mar. 28, 2023), *citing Martin*

*v. Thomas*, 346 So. 3d 238, 245 (La. 2022). *See also* La. Civ. Code. art. 2323(A). Thus, even if Cox is found to have exercised operational control over IOS's operations on ST26D, IOS is not automatically exonerated of fault. *See also Harris v. Tractor Supply Co.*, 377 So. 3d 726, 734-35 (La. Ct. App. 2023), *writ denied*, 377 So. 3d 245 (La. 2024) ("Where reasonable minds can differ as to the comparative fault of the parties, summary judgment is inappropriate.").

Finally, to the extent that the Plaintiff asserts a claim of independent negligence against Sonny and IOS, the IOS Defendants' scant assertion that they "deny any liability for Miller's incident" is insufficient to support summary dismissal of Plaintiff's claims against them.[11] [Doc. 238-1, p. 4]. Therefore, the IOS Motion is DENIED.

## IV. The GSSI Motion [Doc. 238]

GSSI argues in its Motion that there is no evidence in the record that it was negligent in any manner that caused or contributed to Plaintiff's accident. [Doc. 239-1, p. 5]. In response, Plaintiff argues that GSSI was negligent because its employee, who was on fire watch duty over Plaintiff shortly before his accident, should have exercised his stop work authority. [Doc. 253, pp. 13-14]. The non-moving Defendants also filed a response in which they argue that: (i) Plaintiff's Complaint does not limit

---

[11] The Court highlights that Plaintiff's opposition to [Doc. 238] reveals that there are likely disputes of material fact as to Sonny and IOS's negligence, particularly as it relates to Sonny's failure to exercise stop-work authority before the storm hit the platform and properly inspect the storage locker to ensure it was securely fastened to the platform. [Doc. 252]. Moreover, even if Cox was found to exert operational control over the platform operations, it is possible that IOS may remain liable for Sonny's acts under the dual employment doctrine. *See e.g. Morgan,* 710 So. 2d at 1083.

GSSI's negligence to a failure to intervene; (ii) GSSI's employees had the same duty to exercise stop-work authority as the other Defendants' employees; and (iii) there are remaining issues of fact regarding who moved the tool lock and left it unsecured. [Doc. 251].

Under Louisiana negligence law, the existence of a legal duty depends on the facts and circumstances of the case and the relationship of the parties. *Seals v. Morris,* 410 So. 2d 715, 718 (La. 1981). Generally, duty is defined as the obligation to conform to the standard of conduct of a reasonable man under like circumstances. *Id.* Louisiana law generally imposes no affirmative duty to intervene in the unsafe acts of another absent some special relationship between the parties.[12] *See Strickland v. Ambassador Ins. Co.,* 422 So. 2d 1207, 1209 (La. Ct. App. 1982). This is true even if that intervention may prevent an accident from occurring. *Jones v. Buck Kreihs Marine Repair, L.L.C.,* 122 So. 3d 1181, 1186, (La. Ct. App. 2013), *citing Herrington v. BP Products North America, Inc.,* 2003 WL 21362267 (E.D. La. June 10, 2003).

Applying this precedent, courts have found that independent contractors have no duty to intervene in the actions of a worker employed by a separate, unrelated independent contractor when no special relationship existed between the parties. *See e.g. Herrington*, WL 21362267, at *2. But courts have suggested the presence of a duty owed by one independent contractor to another when one contractor exercises

---

[12]  For example, courts have found that the following relationships give rise to a duty: carrier and passenger; innkeeper and guest; shopkeeper and business visitor; jailer and prisoner; and school and pupil. W.L. Prosser, THE LAW OF TORTS, 340-43 (4th ed. 1971). *See also* 12 F.F. Stone, LOUISIANA CIVIL LAW TREATISE: TORT DOCTRINE, 415-16 (1977).

supervisory authority over the other. *See id* (finding no duty on the part of the independent contractor where there <u>was no evidence that the defendant was "overseeing"</u> the operation as opposed to merely observing); *Parta v. Grand Isle Shipyard, Inc.,* WL 5262728 *6 (W.D. La. Dec. 17, 2008) (granting summary judgment where the defendant, an independent contractor with <u>no supervisory authority</u>, owed no duty to intervene in a third-party employer's allegedly unsafe procedure); *Gennuso v. Apache Corp.,* WL 2117822 at *4 (W.D. La. 2017).

Here, the evidence in the record supports a finding that GSSI exercised supervisory control over Plaintiff's safety on the day of the incident. Mr. Cruz, a GSSI employee, was assigned to fire watch duties on the day of the incident. Fire watch responsibilities include monitoring the safety of workers in the designated "hot zone." [Doc. 239-4, pp. 20-21]. These responsibilities include observing and reacting to unsafe working conditions, such as the presence of severe weather.[13] *Id.;* [Doc. 239-12, p. 20]. Although it is undisputed that Mr. Cruz was not actively on fire watch at the time of the incident, genuine issues of material fact exist regarding when he was notified of the approaching severe weather and whether he should have exercised his stop-work authority prior to going on break.[14] [Doc. 239-6, p. 10].

---

[13] A fire watch's primary job is to monitor the immediate workspace environment for any incipient fires or flammable materials that could be ignited. [Doc. 239-12, p. 20]. In addition, the fire watch is there to assist the welders and help them with anything they need. *Id.* Thus, while identifying and addressing fire hazards is a fire watch's principal responsibility, monitoring for unsafe weather conditions is inherently part of ensuring a safe work environment.

[14] Standard break time for individuals on fire watch was 3:00 p.m. [Doc. 239-6, p. 10]. There are issues of disputed fact as to: (i) when the exact time the storm hit, and (ii) when the weather conditions became severe enough that the fire watch should have used their stop-

The Court emphasizes, however, that any duty owed by GSSI arises specifically from Mr. Cruz's role as fire watch. No independent duty is created merely by GSSI's signing of Cox's Job Safety Analysis forms or by the existence of general stop-work authority. *Boutwell*, *supra*, 864 F.2d at 408. Nonetheless, because GSSI's employee held a defined supervisory role over Plaintiff on the day of the incident, and factual disputes remain as to the timing of severe weather notifications and the appropriateness of GSSI's employee's response, summary judgment is not warranted.

GSSI also argues that Plaintiff's negligence claim fails due to the Plaintiff's inability to establish causation. In Louisiana, "[a] proximate cause is generally defined as any cause which, in natural and continuous sequence, unbroken by any efficient, intervening cause, produces the result complained of and without which the result would not have occurred." *Hutto v. McNeil-PPC, Inc.*, 79 So. 3d 1199, 1213 (La. Ct. App. 2011), *quoting Sutton v. Duplessis*, 584 So. 2d 362, 365 (La. Ct. App. 1991). The Court acknowledges that no GSSI personnel were near the cabinet at the time of the incident, [Doc. 239-6, p. 8], and the record suggests that ACE's construction crew — not GSSI — likely moved the cabinet to perform subflooring

---

work authority. At 1:35 p.m., StormGeo sent Cox an updated forecast predicting worsening conditions, including heavy rain and lightning. [Doc. 253-8, p. 1]. At 2:53 p.m., StormGeo issued a Severe Weather Alert warning of severe thunderstorms with frequent lightning, hail, and wind gusts up to 80 knots. [Doc. 253-9, p. 1]. Mr. Lara, who relieved Mr. Cruz as fire watch at 3:00 p.m., confirmed he was on duty when the weather got "bad." [Doc. 239-7, p. 4]. But Plaintiff testified that if GSSI had done their job properly while on fire watch, his injury would not have occurred. [Doc. 251-2, pp. 16-17]. Plaintiff's injury occurred after 4:00 p.m. [Doc. 239-4, p. 7]. And Rodney Dykes, CEO of Cox at the time of the accident, testified that all people on the platform should "be observing the weather with their own eyes in real time and reacting to it." [Doc. 253-5, p. 15]. Accordingly, further factual development is necessary to determine whether Mr. Cruz breached his duty as fire watch by failing to adequately warn and stop work due to the weather before the incident.

work on the platform, *Id.* at pp. 5-6; [Doc. 239-12, p. 11].  But a jury may still determine that GSSI's employee owed Plaintiff a duty to stop work before the storm ravaged the platform and therefore was a proximate cause of Plaintiff's injuries. Accordingly, the motion for summary judgment is DENIED.

## CONCLUSION

For the foregoing reasons, the Court finds that there are genuine disputes of material fact that preclude summary judgment as a matter of law for both motions [Docs. 238, 239].  Fed. R. Civ. P. 56.

Accordingly, IT IS THEREFORE ORDERED:

1. Sonny and IOS's MOTION FOR SUMMARY JUDGMENT, [Doc. 238], is DENIED; and

2. GSSI's MOTION FOR SUMMARY JUDGMENT, [Doc. 239], is DENIED.

THUS, DONE AND SIGNED in Chambers on this 13th day of August 2025.

_____
DAVID C. JOSEPH
UNITED STATES DISTRICT JUDGE